UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CHEP USA,

      PLAINTIFF

v.

WOOTEN ENTERPRISES, INC.,

      DEFENDANT.

NO.   3:23-cv-121-DJH

## CHEP USA'S VERIFIED COMPLAINT

Plaintiff CHEP USA files this verified complaint for damages, declaratory judgment and permanent injunction, and writ of possession against Defendant Wooten Enterprises, Inc., and, in support, alleges and shows the Court as follows:

### PARTIES

1.  CHEP USA ("CHEP") is a New York general partnership with its principal office at 5897 Windward Parkway, Alpharetta, Georgia 30005. The partners of CHEP USA are Brambles North America Incorporated and Brambles Industries, LLC. Brambles North America Incorporated is a Delaware corporation with its principal office and principal place of business at 5897 Windward Parkway, Alpharetta, Georgia 30005. Brambles Industries, LLC, is a Delaware LLC with its principal office and principal place of business at 5897 Windward Parkway, Alpharetta, Georgia 30005. The sole member of Brambles Industries, LLC, is Brambles North America Incorporated.

2.  Wooten Enterprises, Inc., is a Kentucky corporation with its principal office and principal place of business located at 1368 Hemlock St., Louisville, Jefferson County, Kentucky, 40211, and may be served with process by serving its registered agent, David Wooten, at 1368 Hemlock St., Louisville, Jefferson County, Kentucky, 40211, or wherever else he may be found.

69165441;1

## JURISDICTION AND VENUE

3. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

4. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) & (2) because it is the judicial district in which Defendant resides and it is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred

5. This Court has personal jurisdiction over Defendant because Defendant is a Kentucky corporation with its principal office and principal place of business in Kentucky.

## FACTUAL BACKGROUND

### A. Pallets and commerce, generally

6. Typically, as goods move in commerce from their manufacturers, to distributors, to wholesalers, and finally to retailers, where they are made available for purchase by the average consumer, wooden pallets are used for purposes of hauling, loading and unloading, and storing the goods.

7. In general, the majority of pallets circulating in the United States are common white pine pallets that come in varying shapes, sizes, and levels of quality, and bear no trademarks or names. These pallets, bearing no coloring or demarcation, are often called "white wood pallets."

8. In general, these pallets are *bought* by manufacturers who place their product on these wooden platforms. The manufacturers then sell their product, along with the white wood pallet, to their distributors. The distributors then reuse these white wood pallets and sell the excess to pallet dealers or recyclers, who may repair the pallets and resell them to those in need of pallets, or may mulch the pallets.

9. The strength of a pallet is crucial to its usefulness. Pallets that are not adequately inspected and maintained are prone to break because of the constant handling by manufacturers, distributors, and retailers. Such breakage often results in damage to the goods being transported and, at times, injuries to the individuals working with or around the pallet.

    **B.**    **CHEP pallets**

10. CHEP offers a better option for the pallet needs of manufacturers and/or distributors of products and goods.

11. Instead of purchasing new or recycled pallets for each shipment, manufacturers can lease pallets from CHEP as part of a national pallet pool. CHEP, which operates out of over 150 CHEP service centers across the United States, leases its pallets pursuant to its form pallet rental agreement.

12. Through CHEP's national pallet pool, manufacturers receive and ship products on uniform, high quality pallets owned and maintained by CHEP which, after being inspected and repaired (if necessary), are used over and over again by the manufacturers to ship their products.

13. CHEP has invested significant resources, in both time and money, in maintaining superior, reliable, and safe pallets.

14. The CHEP pallet pool rental system involves the shared use of high quality pallets by multiple customers or users. Although there are variations, the following is a general explanation of how the system works: CHEP leases its pallets to manufacturers who use the CHEP pallets as a platform for the transportation of goods to their distributors. The distributors in turn use the CHEP pallets within their distribution system until the original manufacturer's product is emptied from the pallet. The empty pallets are then set aside for return to, or collection by, CHEP. At CHEP service centers across the country, the empty CHEP pallets are inspected, cleaned, repaired and/or repainted (if necessary) and then sent back to manufacturers to repeat the cycle again.

15. CHEP's unique system, where high quality pallets are constantly maintained, controlled, tracked, and reused, benefits the entire supply chain. Manufacturers receive consistent, high quality pallets, reduced pallet expense, reduced transportation costs, and reduced product damage. Distributors and retailers benefit from faster loading and unloading, reduced product damage, and reduced pallet expense.

16. Importantly, the consistent high quality of CHEP's pallets significantly reduces the number of accidents caused by faulty or damaged pallets. Safety is improved at all levels from the manufacturer's plant to the distribution center to the retail store.

17. CHEP's system also removes costs and environmental burdens associated with waste disposal. CHEP estimates that its pallet program saves more than two million tons of solid waste each year. CHEP pallet materials that are no longer usable are mostly recycled into mulch for uses such as animal bedding and industrial sweeping compounds.

18. Given these benefits, it is not surprising that CHEP's pallet pool has been popular with manufacturers and distributors. CHEP continues to invest tens of millions of dollars a year to maintain and supplement its pallet pool.

19. ***CHEP NEVER SELLS ITS PALLETS***. The success—indeed the existence—of CHEP's pallet pool rests on the fundamental principle that CHEP maintains ownership over all of its pallets, which permits CHEP to inspect its pallets regularly to ensure that they continue to meet CHEP's high and consistent quality and strength standards.

20. CHEP's agreements with manufacturers and distributors expressly provide that CHEP owns the CHEP pallets and that the CHEP pallets may never be bought and sold. All CHEP pallets are painted blue on their sides, are inscribed with CHEP's logo, and bear the company's toll-free telephone number and the words "PROPERTY OF CHEP." A true and correct copy of CHEP's

"CHEP Asset Identification & Ownership" flyer is attached hereto as **Exhibit A** and incorporated by reference as if fully set forth herein for all purposes.

21. Pursuant to its rental agreement, CHEP always retains absolute ownership of all of its pallets.

22. The leasing process begins with CHEP entering into an agreement with a manufacturer of goods in need of pallets.

23. In order to retain control and dominion over its pallets, CHEP also enters into pallet retention and return agreements with downstream commercial entities, such as distributors. Before a lessee can ship its product on a CHEP pallet to a downstream entity, it must first obtain approval from CHEP or must know that the downstream entity is already a customer of CHEP.

24. CHEP typically charges its lessees a pallet rental fee on each CHEP pallet within their possession. In this manner, CHEP has created a "leasing pool" of CHEP pallets, and it typically falls on the secondary customer, not the lessee, to return CHEP pallets to CHEP.

25. CHEP makes a concerted effort to track the flow of its pallets. A large number of CHEP employees are dedicated in whole or in part to the protection, recovery, and retrieval of pallets, including logistics managers and coordinators, asset recovery managers and representatives, and office-based analysts and administrative personnel. CHEP's asset recovery team conducts tens of thousands calls and physical visits annually. In particularly egregious cases, CHEP pursues legal action, both in cooperation with governmental enforcement authorities and independently, to protect, recover, and retrieve its pallets. In visiting an entity with which it does not have a contractual relationship, such as Defendant, CHEP will make overtures to that entity to consider entering into an agreement with CHEP.

26. The approximate value of each CHEP pallet is currently $30.00.

### C. Defendant's theft of CHEP pallets

27. Defendant does not have any contractual or other business relationship with CHEP and should never be in possession of any CHEP pallets.

28. Over the course of several months and multiple interactions, CHEP asset recovery representatives visited Defendant's premises and discovered CHEP pallets illegally held at its premises. Specifically, on July 28th, 2020, CHEP's representative visited the Defendant's premises located at 1368 Hemlock Street, Louisville, Kentucky, 40211. The owner, David Wooten, was unavailable at the time, however CHEP's representative spoke to an individual named "Kristi" who was an employee at Defendant's front office. CHEP's representative explained to Kristi CHEP's business model and options of the CHEP ARP Program in reference to CHEP returns. Kristi stated that she would speak with the owner, Mr. Wooten, about the CHEP options when he returns. Kristi also stated that the CHEP Pallets on their property are returned back to the businesses where they collect the white wood. CHEP's representative left a CHEP flyer and his business card and requested that Mr. Wooten contact him at his earliest convenience. Kristi then became upset and instructed CHEP's representative to immediately vacate her office and never return. Accordingly, CHEP's representative left Defendant's premises without any further incident.

29. On July 29, 2020, David Wooten contacted CHEP's representative and threatened to contact law enforcement if CHEP's representative showed up on his lot unannounced in the future. CHEP's representative explained to Mr. Wooten that he made several attempts to contact Defendant during the months prior to his visit to Defendant's premises and that arrangements of a meeting with Mr. Wooten were requested on each occasion, but neither Mr. Wooten nor any other representative of Defendant responded to his requests. Mr. Wooten stated he is not interested

in participating in CHEP's ARP Program and that CHEP pallets on his property are returned back to his customers.

30. On July 26, 2021, and April 25, 2022, CHEP's asset recovery representative hand delivered letters regarding CHEP's exclusive ownership rights in and to CHEP pallets to Defendant. True and correct copies of these letters are attached as **Exhibit B** and incorporated by reference as if fully set forth herein for all purposes.

31. On October 4, 2022, CHEP's asset recovery representative and CHEP's asset protection investigator visited and discovered approximately 50 CHEP pallets mixed with white wood pallets in the back Defendant's premises. They then contacted Kristi to ascertain the disposition of the 50 CHEP pallets and discussed CHEP options. Kristi stated that she would have to discuss the options with Mr. Wooten. When CHEP's employees questioned Kristi as to how they should proceed, Kristi stated that she was interested in CHEP collections but that Mr. Wooten would ultimately make that decision. CHEP's employees provided Kristi with updated CHEP compensation rates, CHEP's Asset Identification & Ownership Identification flyer, (see **Exhibit A**), and a business card, and requested that Mr. Wooten contact them as soon as possible to discuss CHEP's property. The flyer clearly states that "CHEP Pallets are the property of CHEP" and that CHEP's property is clearly marked as "Property of CHEP" on the sides of the pallets. (See id.) It further clarifies that CHEP never sells its pallets or containers and retains ownership of them at all times and that, as a result, no one else may obtain title to CHEP equipment and under no circumstances may CHEP pallets or containers be bought or sold. (See id.) Kristi stated that she would pass the information on to Mr. Wooten.

32. From October 13 to October 25, 2022, CHEP's asset protection investigator made several attempts to contact a representative of Defendant regarding the CHEP pallets that were illegally in Defendant's possession but was unsuccessful.

33. On November 3, 2022, through the course of his normal business, a separate CHEP employee discovered approximately 150 CHEP pallets stacked on the outside of a business identified as "HB Molding" located in Louisville, Kentucky. HB Molding is not a client of CHEP and does not have any right to use, own, or possess CHEP's pallets. CHEP's employee spoke with HB Molding's account manager, Diane Hoffman, to discuss how HB Molding came into possession CHEP's property. Ms. Hoffman explained that they purchased the CHEP pallets weekly from Defendant and have for several years. CHEP's employee explained he would forward HB Molding's information to the CHEP asset recovery team and someone would contact her.

34. On November 8, 2022, CHEP's asset protection investigator visited HB Molding and observed approximately 100 CHEP pallets stacked on the southside of the business. True and correct copies of photos taken of CHEP's pallets at HB Molding on November 8, 2022, are attached as **Exhibit C** and incorporated by reference as if fully set forth herein for all purposes.

35. CHEP's asset protection investigator entered HB Molding's premises and spoke with its purchasing manager, Sharon Murphy. CHEP's investigator handed Ms. Murphy a business card and explained that the CHEP Pallets located on the side of HB Molding business cannot be bought, sold, or otherwise used by the business without a contract, and that HB Molding was responsible for safeguarding CHEP's property until CHEP can recover its pallets.

36. Ms. Murphy explained that during her ten-year tenure with HB Molding they have always purchased CHEP pallets from Defendant. Ms. Murphy requested that CHEP's investigator walk with her to Ms. Hoffman's office to discuss further details regarding HB Molding's purchase of CHEP pallets and its transactions with Defendant.

37. Both Ms. Murphy and Ms. Hoffman stated that they have been employed with HB Molding for the last ten years. Ms. Murphy explained that, in the past ten years, HB Molding

requested a minimum of 140 CHEP pallets and a maximum of 180 CHEP pallets weekly from Defendant. Ms. Hoffman and Ms. Murphy explained that Defendant has always provided CHEP pallets as requested by HB Molding. They further indicated that HB Molding personnel were not aware that they could not purchase CHEP pallets from anyone or from Defendant. Both ladies explained that had they known years earlier about CHEP's ownership rights, HB Molding would have never been involved with purchasing CHEP pallets from Defendant. CHEP's representatives provided a copy of the CHEP Pallet Asset Identification & Ownership flyer to Ms. Murphy and Ms. Hoffman.

38. HB Molding provided CHEP with invoices reflecting its purchases of CHEP pallets from Defendant from September – November 2022, which reflect sales of approximately 656 CHEP pallets amounting to nearly $20,000.

39. On November 22, 2022, CHEP's asset protection investigator visited HB Molding and spoke with its facility manager, Russ Fallon. Mr. Fallon provided CHEP with an additional 304 invoices dating back from November 2014 to November 2022, and surveillance video footage of Defendant's illegal delivery of CHEP pallets to HB Molding. The total number of pallets sold by Defendant to HB Molding was 39,073 for a total profit of $174,562.75. At the standard $30/pallet rate, CHEP has suffered a loss of approximately $1,172,190 as a result of Defendant's illegal sale of CHEP pallets to HB Molding alone. The financial loss CHEP has and continues to suffer as a result of Defendant's illegal sale of CHEP pallets to other businesses is currently unknown.

40. On December 14, 2022, CHEP's asset protection investigator completed a drive-by of Defendant's premises during and after regular business hours and observed stacks of CHEP pallets tucked behind stacks of white wood pallets on the property. True and correct copies of photographs of CHEP pallets observed on Defendant's premises are attached as **Exhibit D** and incorporated by reference as if fully set forth herein for all purposes.

41. Despite CHEP's numerous and continuing efforts to recover its pallets from Defendant, Defendant has failed and refused to cease and desist its illegal acquisition and sale of CHEP's pallets, or to allow the recovery of the CHEP pallets wrongfully and illegally being held by Defendant.

42. Upon information and belief, Defendant is in possession of well over 200 CHEP pallets. The number of CHEP pallets that Defendant has illegally sold to third parties is currently unknown but is expected to exceed 40,000 pallets.

## COUNT I – CONVERSION

43. All paragraphs above are incorporated herein as if set out fully.

44. CHEP owns and possesses legal title to the CHEP pallets which are personal property.

45. Defendant has in the past and continues to intentionally and wrongfully exercise dominion or control over the CHEP pallets despite notice that Defendant does not have any ownership rights with respect to the CHEP pallets and does not have any right to possess the CHEP pallets.

46. Defendant has refused CHEP's demands that Defendant relinquish control of the CHEP pallets and return the CHEP pallets to CHEP.

47. At the time Defendant came into possession of the CHEP pallets, Defendant did not own the CHEP pallets and did not have any right to possess the CHEP pallets.

48. CHEP has been damaged by Defendant's continued actions with respect to the CHEP pallets.

49. As a result of Defendant's conversion of the CHEP pallets, CHEP seeks return of the pallets and actual monetary damages in the sum of money necessary to compensate it for actual losses sustained including, but not limited to, (i) loss of value, (ii) loss of use, (iii) shipping costs, and (iv) travel expenses.

50.  CHEP's injury resulted from Defendant's malice or actual fraud, which entitles CHEP to exemplary damages under KRS 411.184(2).

### COUNT II – DECLARATORY JUDGMENT & PERMANENT INJUNCTION

51.  All paragraphs above are incorporated herein as if set out fully.

52.  CHEP seeks a declaratory judgment pursuant to KRS ch. 418 to establish the rights, status, and ownership of the CHEP pallets currently illegally possessed by Defendant.

53.  The CHEP pallets are solely and exclusively CHEP's property, and Defendant does not have any ownership or other rights to the CHEP pallets.

54.  CHEP is entitled to the declaratory relief sought herein because, *inter alia*, (i) there is a justiciable controversy about the rights and status of the parties and the declaration would resolve the controversy; (ii) the controversy is real and substantial, involving a genuine conflict of tangible interests and not merely a theoretical dispute; and (iii) absent the issuance of declaratory relief, CHEP will be irreparably injured.

55.  CHEP requests that the Court declare that CHEP is the sole and exclusive owner of the CHEP pallets and that Defendant does not have, and has never had, any ownership or other rights to the CHEP pallets.

56.  CHEP further requests that this Court enter a permanent injunction enjoining Defendant from continuing to wrongfully possess, use, and assert control over the CHEP pallets, and to require Defendant to preserve the pallets.

### COUNT III – REPLEVIN / REQUEST FOR WRIT OF POSSESSION

57.  All paragraphs above are incorporated herein as if set out fully.

58.  CHEP requests that the Court issue a writ of possession pursuant to KRS 425.011, *et seq.* and Federal Rules of Civil Procedure 4.1(a) & 64. This suit is for title and possession of CHEP's pallets, which are personal property wholly and exclusively owned by CHEP. Based on the verified

facts asserted above, a reasonable conclusion may be drawn that there is immediate danger that Defendant has and will continue to conceal, dispose of, ill-treat, waste, and/or destroy CHEP's pallets, and/or will remove them from the county during this lawsuit.

## PRAYER FOR RELIEF

CHEP respectfully requests that it be awarded a judgment against Defendant for the following:

a. a declaratory judgment that CHEP has sole and exclusive ownership over CHEP pallets;

b. a permanent injunction enjoining Defendant from continuing to wrongfully use and possess CHEP's pallets;

c. a writ of possession for return of the stolen or converted property;

d. actual damages and exemplary damages;

e. additional statutory damages up to $1,000 from Defendant;

f. pre-judgment and post-judgment interest along with Court costs;

g. attorneys' fees; and

h. all other relief to which CHEP is entitled, whether in equity or in law.

## VERIFICATION

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and accurate. Executed on March 10, 2023.

*/s/ Mario Birsa*
MARIO BIRSA
National Asset Protection & Security Manager
for Plaintiff, CHEP USA

69165441;1

Respectfully submitted,

/s/ *Zachary M. VanVactor*
Marjorie A. Farris
Zachary M. VanVactor
STITES & HARBISON PLLC
400 West Market Street, Suite 1800
Louisville, KY 40202
(502) 587-3400
mfarris@stites.com
zvanvactor@stites.com

*Counsel for Plaintiff CHEP USA*